ROMIE L. THOMAS AND CATHERINE L. THOMAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Thomas v. Commissioner
Docket No. 6419-85.
United States Tax Court
T.C. Memo 1987-511; 1987 Tax Ct. Memo LEXIS 507; 54 T.C.M. (CCH) 839; T.C.M. (RIA) 87511; September 29, 1987. *508 Kenneth G. Anderson and James P. Stevens, for the petitioners. Gioele Settembrini, Jr., for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency in petitioners' 1980 income tax in the amount of $ 16,922. By an amendment to his answer, respondent increased the deficiency to $ 110,890.25. After concessions, the remaining issues are (1) whether petitioner husband received a constructive distribution of $ 498,450.81 upon the foreclosure sale of property owned by a subchapter S corporation in which he was the principal stockholder, officer and director, and (2) whether petitioner husband is entitled to a deduction of $ 64,991.00 as his share of the corporation's net operating loss. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits associated therewith are incorporated herein by reference. Petitioners Romie L. Thomas and Catherine L. Thomas, husband and wife, resided in Ponte Vedra Beach, Florida at the time of filing their petition. Their joint 1980 Federal income tax return was filed with the Internal Revenue Service Center *509 at Atlanta, Georgia. The history of this controversy begins in July 1972 when Romie L. Thomas (petitioner), Charles Roberts (Roberts) and Jerold Ford (Ford) purchased ten acres of undeveloped land for the purpose of developing a racquet club. The cost of the land was $ 60,000 plus closing costs of $ 715.83. When purchased, the land was held as tenants in common, the respective interests being 50 percent, 25 percent and 25 percent, but Roberts and Ford each subsequently conveyed a 5 percent interest in the property to petitioner and the respective interests became 60 percent for petitioner, 20 percent for Roberts, and 20 percent for Ford. On January 3, 1973, petitioner along with Roberts and Ford, and each of their wives, entered into an agreement with the Jacksonville National Bank (JNB) for the purpose of obtaining a construction loan in the amount of $ 500,000 for the racquet club project and pursuant to the agreement executed a mortgage note in which petitioner, Roberts and Ford and their wives jointly and severally promised to pay JNB the principal of $ 500,000 with interest at 8-1/2 percent per annum on or before July 1, 1974. The note was secured by a mortgage on the *510 racquet club property and any improvements made to the property. Under the mortgage petitioners, as well as their co-makers, were obligated to pay all reasonable attorney's fees, costs and expenses incurred by JNB in any action, proceeding or dispute affecting the note, any borrower, or the mortgaged property. In addition, the borrowers waived any right of appraisement, valuation, stay, extension, or redemption to prevent a foreclosure and, in the event of foreclosure, authorized JNB to recover a deficiency judgment against them for any portion of the principal and interest remaining unpaid. The $ 500,000 construction loan was expanded to $ 600,000 with the execution of an additional $ 100,000 mortgage note on June 29, 1973 by the same makers, i.e., petitioner, Roberts, and Ford and their respective wives, who acknowledged that the additional $ 100,000 note was secured by the original mortgage upon the same terms and conditions and to the same extent as though it had been executed on the date of the mortgage. In the meantime, petitioner, Roberts, and Ford had formed The Racquet Club Partnership (partnership) for the purpose of holding and leasing the property. The property *511 constituted the initial partnership capital. The partnership agreement was executed by the parties on June 25, 1973 but by its terms was effective as of January 1973. The agreement specified that partnership net profits and losses were to be divided between the partners in accordance with their ownership percentages in the property, or 60 percent, 20 percent, 20 percent. On the same date, June 25, 1973, the partnership leased the racquet club property for a term of five years beginning on July 1, 1973 to The Racquet Club, Inc., (corporation) which had been organized under the laws of Florida on April 13, 1973, and had filed a timely election to be treated as a small business corporation for income tax purposes. The corporation was organized by petitioner, Roberts, and Ford who were its initial shareholders, officers, and directors. At all relevant times, petitioner was the corporation's president, majority shareholder, and a director. As president, he executed all of the corporation's contracts, notes, and other documents which are a part of this record. Construction of the clubhouse, tennis courts and other facilities, which had commenced in January 1973, was completed *512 about the end of June 1973 and the facility was opened for business by the corporation in July 1973, under the name of The Racquet Club although it was sometimes referred to as The Rolling Hills Racquet Club. The corporation operated the racquet club business through 1980. Michael Thomas, petitioner's son, purchased for $ 6,000 Roberts' 20 percent interest in the partnership and his stock in the corporation on August 31, 1973. As a part of this purchase, petitioner and Michael Thomas agreed to "assume all obligations, debts and loans" relating to the racquet club property and to "indemnify, protect and save harmless" Roberts and his wife from the promissory notes executed with respect to the racquet club. On July 1, 1974, petitioner, Michael Thomas, and Mr. and Mrs. Ford entered into a modification agreement with JNB regarding the mortgage on the racquet club property and the notes it secured, in which it was agreed that the two notes of $ 500,000 and $ 100,000 dated January 3, 1973, and June 29, 1973, respectively, were "spread, consolidated and coordinated" to be one note in the principal amount of $ 600,000 payable together with interest at 10 percent per annum, in accordance *513 with a new repayment schedule to begin on September 1, 1974 and that the mortgage securing the notes constituted one first mortgage and a single lien on the racquet club property. By agreements dated September 19, 1974, petitioner purchased Ford's 20 percent interest in the partnership and his stock in the corporation and assumed all obligations, debts and loans of Ford and his wife with respect to the racquet club property and agreed to "indemnify, protect and save harmless" the Ford's from such obligations. After the sale by Ford on September 19, 1974, the interests of petitioner and Michael Thomas in the partnership were 80 percent and 20 percent, respectively, and petitioner owned 95 percent and Michael Thomas owned 5 percent of the capital stock of the corporation. There were no further changes in the ownership interests in the property, partnership, and corporation until December 1976. However, between September 19, 1974, and December 30, 1976, petitioners, Michael Thomas, and JNB entered into several agreements modifying the terms of payment on the mortgage notes. The modification agreements incorporated the terms, covenants, and conditions of the original notes and *514 mortgage, as modified by previously executed modification agreements. On December 30, 1976, petitioner and Michael Thomas agreed to sell the racquet club property, [1] including all improvements and associated personal property, to the corporation for $ 543,437.66. As stated in the sale agreement, the purchase price was allocated as follows: Land
$  65,674.50
Site Improvements
31,303.41
Landscaping
5,047.41
Buildings
255,807.46
Building Improvements
13,575.73
Tennis courts
130,936.18
Pool
14,791.20
Equipment
26,301.77
Total
$ 543,437.66
There is no reference to the JNB mortgage and mortgage notes in the agreement. In total consideration for the sale of his interest, petitioner received a promissory note from the corporation in the principal amount of $ 434,750.1 (80 percent of the total selling price) and for the sale of his interest Michael Thomas received a promissory note from *515 the corporation in the principal amount of $ 108,687.53 (20 percent of the total). Both notes were subject to interest at the rate of 10 percent per annum. [2] The notes required the corporation to make monthly payments to petitioner and Michael Thomas of $ 4,800 and $ 1,200, respectively, until the interest and principal were paid. [3] By warranty deed dated December 30, 1976, petitioner and Michael Thomas as tenants in common conveyed their respective interests in the racquet club property of 80 percent and 20 percent to the corporation. In the warranty deed petitioner and Michael Thomas convenanted that they were lawfully seized of said property in fee simple; that they had good right and lawful authority to sell and convey the same; that they fully warranted the title thereto; and that said property was free of all encumbrances, except taxes accruing subsequent to December 31, 1976. *516 Petitioner reported the sale of his interest in the racquet club property at no gain or loss on the joint return for 1976. The calculations on the return reflect a combined gross sales price for his interest in the racquet club land, buildings and improvements of $ 427,966 and a combined basis in those assets of $ 427,966. In 1977 and 1978, three additional modification agreements concerning the mortgage and related indebtedness on the racquet club property were executed by petitioner, Michael Thomas, and JNB. The agreements, dated February 10, 1977, July 10, 1977, and February 21, 1978, are similar to the previous modification agreements, i.e., the obligations imposed by the original notes and mortgage are reaffirmed and new terms of payment are specified. The corporation was not a party to any of the agreements. However, on November 9, 1979, the corporation and JNB executed a modification agreement wherein the corporation acknowledged the indebtedness to JNB for the $ 477,233.42 then secured by the racquet club property. The agreement provides, in pertinent part: * * * in consideration of the mutual covenants hereinafter set forth and in pursuance of this Agreement and *517 in consideration of Ten Dollars ($ 10.00) and other valuable considerations * * * the parties hereto agree that the aggregate principal balance of the Note with interest thereon at ten percent (10%) per annum shall be paid on the dates and in the modified amounts as follows: FIRST: That on the tenth day of November, 1979, and on the tenth day of each and every month thereafter, there shall be paid the sum of FOUR THOUSAND SIX HUNDRED TEN AND NO/100 DOLLARS ($ 4,610.00) per month except that the entire indebtedness [evidenced] hereby, if not sooner paid shall be due and payable on the first day of August, 1984. * * * The Racquet Club [corporation] covenants and agrees that there is due and unpaid on the Note the principal sum of FOUR HUNDRED SEVENTY SEVEN THOUSAND TWO HUNDRED THIRTY THREE and 42/100 DOLLARS ($ 477,233.42) together with interest thereon as above stated, from October 10, 1979, without offsets, credits or defenses of any kind, and the Note is secured by the lien of the Mortgage, as modified. SECOND: The aforesaid Note and Mortgage and all their terms, covenants, conditions, agreements and stipulations shall remain in full force and effect except as spread, consolidated, *518 and coordinated, and as further modified by this Agreement. * * * Still another modification agreement and an accompanying memorandum were executed on March 18, 1980, by petitioner, the corporation, and JNB. Again, the payment terms were adjusted and the agreement further provides, in pertinent part: * * * the parties hereto agree as follows: 1. Recitals. Makers [petitioners], Mortgagee [JNB] and Racquet Club [corporation] hereby ratify and confirm all of the Modification Agreements and approve and adopt all of the modifications therein set forth. 2. Estoppel. Makers and Racquet Club expressly covenant and agree, represent and warrant that as of the date thereof, the principal balance of the Note is $ 475,970.96, with interest thereon accruing at the rate of 10% per annum. * * * 3. Confirmation.
(a) Racquet Club and Makers jointly and severally ratify, covenant, and agree and confirm that they are jointly and severally liable to pay the principal balance of the Note and interest which accrues thereon, all of which is secured by the Mortgage. Neither Racquet Club nor any Maker have any offsets, credits or defenses of any kind to the enforcement of *519 the Note and Mortgage. * * * (b) * * * Makers and Racquet Club reaffirm all of the grants, hypothecations, mortgages, encumbrances and security interests created, granted and confirmed in the Mortgage and to the extent not created, granted and confirmed, grant a security interest to Mortgagee in all [inventories, supplies, equipment, accounts receivables, contract rights or revenues] now or hereafter owned by or due Racquet Club or Makers in connection with the operation of the tennis and recreational club and related facilities located on the Mortgaged Property or from any management agreement or other agreement pertaining thereto or any cash or securities held thereunder, all as security by Mortgagee for the due and punctual performance of all the obligations of Racquet Club and Makers under the Note, Mortgage Modification Agreements and this Agreement. * * * The accounting books, records and tax return of the corporation for its 1980 taxable year do not reflect any liability owed to JNB and there is no mention of any assumption by the corporation of the JNB indebtedness in the corporation's minute book. However, all such records of the corporation reflect the corporation's *520 indebtedness to petitioner and Michael Thomas which was incurred upon the acquisition by the corporation of the racquet club property in 1976. By checks dated January 11, 1980, payments were made by the corporation on its indebtedness to petitioner and Michael Thomas. The checks were endorsed by petitioner and Michael Thomas and delivered to JNB where they were applied to the indebtedness due JNB. On its books and records, the corporation applied the payments as a reduction to its indebtedness to petitioner and Michael Thomas. The corporation made three payments directly to JNB on the mortgage notes by checks dated March 19, April 10, and May 3, 1980. These payments were also reflected on the corporation's books as reductions in the corporation's liabilities to petitioner and Michael Thomas. On October 29, 1980, JNB commenced a civil suit in a state court against petitioners and the corporation seeking to foreclose the mortgage on the racquet club property and to have a receiver appointed for the corporation. On the same day, the defendants and JNB filed with the state court a document entitled "Answer of Defendants and Stipulation and Settlement Agreement," in which it was *521 agreed, inter alia, that: (1) Michael Thomas would manage the racquet club property during the pendency of the foreclosure action, subject to the ongoing consent and approval of JNB; (2) Petitioners would transfer and assign to JNB their respective right, title and interest in and to all notes, bonds, debentures, indentures, debts, accounts or other obligations owed each of them by Defendant Racquet Club [corporation] which obligations totaled $ 536,863.67; (3) Petitioners and corporation would consent to the entry of a final judgment of foreclosure, waive notice of a foreclosure sale, and waive any rights to appeal a final judgment or to file objections to the foreclosure sale; and (4) JNB covenanted not to pursue a deficiency judgment against the corporation or petitioners provided a bankruptcy or any other insolvency proceeding was not brought by or against petitioners or the corporation within one year of the foreclosure sale. A final judgment was entered in the foreclosure action on November 25, 1980, which incorporated the terms and conditions of the stipulation and settlement agreement. At the foreclosure sale on December 18, 1980, the racquet club property was *522 sold to JNB for $ 100 and as a result of the foreclosure, JNB charged off on the indebtedness due it $ 471,300.56 in principal, plus interest of $ 5,473.28, ad valorem taxes of $ 13,553.56, trustee fees of $ 4,226.85 and attorney fees of $ 3,896.56, or a total of $ 498,450.81. JNB did not seek a deficiency judgment against petitioners or the corporation. On December 31, 1980, JNB sold the racquet club property to an unrelated third party for $ 526,475. For each year the racquet club was in operation the corporation incurred substantial operating losses. The distributive shares of such losses deducted by petitioners on their income tax returns were as follows: Year
Claimed Loss
1973
[4] $ 15,974.51
1974
1,709.22
1975
36,483.80
1976
94,587.00
1977
94,259.17
1978
78,157.00
1979
92,951.00
1980
64,991.00
In 1980, petitioners' unadjusted basis in the stock and indebtedness of the corporation was $ 505,823.67 which was comprised of the following: Notes payable to Romie L. Thomas
$ 132,930.99
Notes payable to Romie L. Thomas
$ 368.932.68
Distributive share of capital
$   1,350.00
Distributive share of paid-in
surplus
$   2,610.00
Total
$ 505,823.67
*523 Neither petitioners nor the corporation reported any gain with respect to the foreclosure sale of their 1980 income tax returns. Petitioners subsequently conceded, however, that the corporation had realized a long term capital gain by virtue of the foreclosure and that the corporation's net operating loss for 1980 should be reduced accordingly. The amount realized by the corporation upon the foreclosure sale of the racquet club property was the amount charged off by JNB pursuant to the foreclosure judgment of $ 498,450.81, and its adjusted basis in the assets transferred to JNB for purposes of determining gain was $ 453,886.07. [5] Therefore, the corporation had an unreported long term capital gain of $ 44,564.74 in 1980 and a net operating loss in 1980, after adjustments for the unreported gain, interest and taxes, in the amount of $ 49,556.10. [6]
*524 In the notice of deficiency, respondent disallowed petitioners' net operating loss deduction of $ 64,991. [7] By amendment to his answer, respondent increased the deficiency to $ 110,890.25 and advanced four theories in support of the increase. As set forth in subparagraphs m through p of paragraph 7 of the respondent's amendment to answer the four theories are as follows: m. The satisfaction of [JNB's] mortgage note by foreclosure of the racquet club property, which was owned by the corporation, resulted in the satisfaction of the corporation's note issued to the petitioner, Romie L. Thomas, and therefore, constituted income to the petitioners. n. In the alternative, the petitioner realized income when the bank foreclosed on the racquet club property because this constituted a distribution of a corporate asset to satisfy the petitioner's personal liability to the bank. o. In the alternative, the bank's foreclosure of the racquet club property constituted a cancellation of the corporation's indebtedness, since the indebtedness exceeded the adjusted basis of the racquet club property, *525 and therefore, the income attributable to the corporation must be passed through to the petitioners. p. In the alternative, the bank's foreclosure of the racquet club property constituted a cancellation of the petitioner's liability to the bank, since the indebtedness exceeded the adjusted basis of the racquet club property, and therefore, the petitioner realized income.
Respondent's first theory was abandoned prior to trial. His last two theories were not argued at trial and were expressly abandoned on brief. Thus, only respondent's second theory was pursued at trial and on brief. OPINION Respondent's remaining theory, as clarified on brief, is that petitioners received a constructive distribution of $ 498,450.81 under section 301 when the corporation agreed to the foreclosure on the corporation's assets to extinguish the JNB debt. [8] Citing section 301(c)(3), [9] respondent contends that the tax effect of the constructive distribution is a long term capital gain to petitioner of $ 498,450.81 since the corporation had no earnings and profits in 1980 and petitioner's basis in his stock was zero. *526 Respondent has the burden of proving the facts to support the increased deficiency. Rule 142(a). It is well settled that if a taxpayer's obligation is paid by a third party, the effect is the same as if the third party had paid the taxpayer who in turn paid his creditor. Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929). In the context of a corporate payment of an obligation of its shareholder, the payment may constitute a constructive distribution to the shareholder. Sachs v. Commissioner,32 T.C. 815, 820 (1959), affd. 277 F.2d 879 (8th Cir. 1960), cert. denied 364 U.S. 833 (1960). The constructive distribution is treated as a dividend to the shareholder to the extent the corporation has earnings and profits. See, e.g., Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980). In the absence of corporate earnings and profits the distribution is treated as gain to the shareholder from the sale or exchange *527 of property to the extent the distribution exceeds his adjusted basis in the corporation's stock. Sec. 301(c)(3). The absence of any formal action by the corporation's board of directors will not preclude a finding that a distribution has occurred. Yelencsics v. Commissioner, supra;Silverstein v. Commissioner,36 T.C. 438, 441 (1961). Further, there is no rule which forbids treating corporate payments on behalf of shareholders as constructive distributions merely because the shareholders may also be creditors of the corporation. Cf. Levy v. Commissioner,30 T.C. 1315, 1327 (1958). For constructive distribution treatment to apply, however, it must be shown that a distribution occurred, constructive or otherwise, and that the distribution was made with respect to stock. Section 301(a); see Sammons v. Commissioner,472 F.2d 499 (5th Cir. 1972), affg. in part and revg. in part on a question of fact a Memorandum Opinion of this Court; cf. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), *528 cert. denied 404 U.S. 940 (1971); Bonner v. City of Pritchard,661 F.2d 1206, 1209 (11th Cir. 1981). As a general rule a constructive distribution occurs when corporate assets are diverted to or come within the control of, a shareholder without adequate consideration for the diversion. Sammons v. Commissioner, supra at 451, 453-454. A constructive distribution can also result where a corporation discharges a joint obligation of the corporation and its shareholder, if the corporation gratuitously incurred the liability for the benefit of the shareholder. See, e.g., Yelencsics v. Commissioner, supra at 1529-1530. However, where a corporate expenditure is incurred not for the benefit of its shareholder but to fulfill a bona fide corporate obligation, a constructive distribution does not occur. See United States v. Smith,418 F.2d 589 (5th Cir. 1969). In this case neither party disputes that by the date of the foreclosure the corporation was legally obligated to JNB for the repayment of the mortgage indebtedness. Clearly, the foreclosure judgment entered by the state court was against both petitioners and the *529 corporation. Thus, when the corporation used its assets to satisfy the foreclosure judgment, it was paying a liability found by the court to be imposed directly upon the corporation. However, our inquiry does not end with a determination that the corporation was extinguishing its own legal obligation. In Yelencsics v. Commissioner, supra, we rejected the taxpayers' argument that there can be no constructive distribution where a corporation discharges its own legal obligation. In that case the corporation made payments on notes which it had executed as a comaker for the purchase of stock by its shareholders. After determining that the corporation's obligation was incurred without consideration and served no valid corporate purpose, we concluded that the corporate payments were constructive dividends. Therefore, to determine the tax impact on petitioners of the foreclosure in this case, we must ascertain why the corporation incurred the liability in the first place. See United States v. Smith, supra at 595-596; Yelencsics v. Commissioner, supra at 1529-1530. If the corporation gratuitously assumed petitioners' personal liability *530 to JNB without any valid corporate business purpose, a constructive distribution may result in spite of the fact that the corporation was legally obligated to JNB by the date of foreclosure. See Yelencsics v. Commissioner, supra.
On the facts before us, we are convinced that the corporation incurred the JNB liability for a valid business purpose and not gratuitously. First, by obligating itself to JNB, the corporation preserved, albeit only temporarily, valuable corporate property. While the corporation may only have been bargaining for time, its efforts to forestall a foreclosure nevertheless served a valid corporate purpose. Further, we cannot agree with respondent's assertion that the liability was incurred gratuitously. From 1976 until the date of the foreclosure, the corporation was indebted to petitioners and, in turn, petitioners were indebted to JNB. [10] The record demonstrates a direct correlation between the payments made by the corporation to JNB and the preexisting corporate indebtedness to petitioners. For example, to the extent the corporation made payments on its indebtedness to petitioners the checks were endorsed and delivered to JNB and to *531 the extent the corporation made payments directly to JNB, the corporate indebtedness to petitioners was reduced. Furthermore, the corporate indebtedness to petitioners was assigned to JNB as part of the final settlement of the foreclosure. In effect, two liabilities -- the corporate liability to petitioners, as well as the JNB liability -- were extinguished. On these facts, the significance of the corporation's debt to petitioners cannot be ignored. Respondent's burden was to prove petitioner received from the corporation a distribution "with respect to its stock." Section 301(a). Clearly, respondent's reliance on section 301 and a constructive distribution theory was misplaced because the JNB liability was not borne by the corporation gratuitously, but was borne to *532 discharge a pre-existing debt of the corporation to petitioners. The repayment of a valid corporate debt [11] owed to a shareholder does not constitute a constructive distribution since the shareholder has received nothing from the corporation without consideration. See Sammons v. Commissioner, supra at 454. In such a situation, the payment is received as a creditor, not as a shareholder, and section 301 does not apply. Accordingly, we conclude that petitioners did not receive a constructive distribution under section 301 as a result of the foreclosure. As a final matter, we address petitioner's entitlement to a deduction of $ 64,991.00 as his distributive share of the corporation's operating loss. Petitioners did not separately argue respondent's disallowance of the loss deduction at trial, apparently because they were under the impression that the issue was resolved by the stipulated facts. However, the stipulations pertaining *533 to the loss disallowance were limited, and do not clearly resolve the matter one way or the other. Since respondent's determination with respect to the loss was made in the deficiency notice his disallowance of the deduction is presumed correct, and petitioners have the burden of proof on this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 1374(b), as in effect for 1980, generally allows as a deduction to a shareholder in an electing small business corporation an amount equal to the shareholder's portion of the corporation's net operating loss. However, section 1374(c)(2) limits the deduction to the amount of the shareholder's adjusted basis in his stock and any indebtedness of the corporation determined, in most instances, as of the close of the taxable year. Sec. 1374(c)(2); sec. 1.1374-1(b)(4)(ii), Income Tax Regs.
Since petitioners assigned to JNB all of their right, title and interest in and to the corporation's indebtedness to them as a part of the settlement of the foreclosure which occurred on November 25, 1980, petitioners *534 have failed to establish their basis, if any, in their investment in the corporation at the close of the 1980 taxable year. Accordingly, we sustain respondent's determination with respect to this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The record does not reflect the exact manner in which title to the property was conveyed from the original tenants in common (petitioner, Roberts, and Ford) to petitioner and Michael Thomas who ultimately conveyed the property to the corporation.↩
2. Both notes are dated December 31, 1977, however the parties have agreed that the dates should state December 31, 1976. ↩
3. We note that the combined monthly payments on these notes ($ 6,000) coincided with the total amount payable to JNB on the mortgage notes dated January 3, 1973 and June 29, 1973, as modified. ↩
4. The distributive share of the loss claimed on petitioners' 1973 income tax return was subsequently adjusted downward to $ 2,750. ↩
5. We note that in petitioners' brief a larger amount was used for adjusted basis in determining the gain of the corporation but the larger amount is not in accord with their earlier stipulation and we have disregarded their calculations to that extent. ↩
6. The net operating loss in 1980 is calculated as follows: ↩
Loss reported on corporation's return
$ 75,094.00
Unreported interest expense
5,473.28
Unreported taxes expense
13,553.56
Subtotal
$ 94,120.84
Less:
Unreported gain on foreclosure
$ 44,564.74
Revised net operating loss
$ 49,556.10
7. Other adjustments in the notice of deficiency have been resolved by the parties. ↩
8. All section reference are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
9. Section 301(c)(3) as in effect during 1980 reads as follows: (3) AMOUNT IN EXCESS OF BASIS. -- (A) IN GENERAL. -- Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. (B) DISTRIBUTIONS OUT OF INCREASE IN VALUE ACCRUED BEFORE MARCH 1, 1913. -- That portion of the distribution which is not a dividend, to the extend that it exceeds the adjusted basis of the stock and to the extent that it is out of increase in value accrued before March 1, 1913, shall be exempt from tax. ↩
10. We reject petitioners' attempt to repudiate their liability to JNB by arguing the corporation assumed their debt to JNB prior to 1980. There is no support in the record for a finding that prior to 1980 petitioners were released from the JNB obligation or that their liability was secondary. In fact, in the settlement of the foreclosure matter in 1980 petitioners admitted they were still liable to JNB. ↩
11. We note that respondent does not question the validity of the indebtedness to petitioner or that it was in the nature of stock rather than debt. ↩